**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

P & O NEDLLOYD, LTD.                                           PLAINTIFF

        v.              Civil No. 04-5057

SAMS MANAGEMENT GROUP, INC.                                    DEFENDANT

        v.

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, Subscribing to Insurance
Contract No. MC02ADKH                          THIRD PARTY DEFENDANTS

## MEMORANDUM OPINION

Now on this 23rd day of August, 2005, comes on for consideration **Third Party Defendant's Motion For Summary Judgment** (document #51), and from said motion, the supporting documentation, and the response thereto, the Court finds and orders as follows:

1. Plaintiff P & O Nedlloyd, Ltd. ("P&O") sued to recover on an account for services rendered to defendant Sams Management Group, Inc. ("Sams") in connection with four shipments (24 cargo containers) of frozen chicken to St. Petersburg, Russia. Sams counterclaimed that P&O had failed to provide the services promised, as a result of which its goods were lost, and prayed for recovery of their value[1].

Sams also filed a third-party complaint against its insurer,

---
[1] On June 30, 2005, the Court granted summary judgment in favor of P&O on this counterclaim to the extent that it seeks affirmative relief, but allowed it to stand to the extent that is seeks recoupment against any sums that might be awarded to P&O.

Certain Underwriters at Lloyd's London Subscribing to Insurance Contract No MC02ADXH ("Lloyd's"), seeking to recover for the lost cargo under the insurance contract (the "Policy"). P&O then amended its complaint to allege that it is a third-party beneficiary of the Policy.

Lloyd's denied the material allegations of the complaints as against it, and now moves for summary judgment.

2. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States, 31 F.3d 696 (8th Cir. 1994).** Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. **Hardin v. Hussmann Corp., 45 F.3d 262 (8th Cir. 1995).** The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. **City of Mt. Pleasant, Iowa v. Associated Electric Co-op, 838 F.2d 268 (8th Cir. 1988).**

3. Pursuant to **Local Rule 56.1,** Lloyd's filed a statement of facts which it contends are not in dispute. Sams responded to,

and disputed certain of, those facts.[2] From those statements, the following significant undisputed facts are made to appear:

* Sams was, at all relevant times, in the business of selling frozen chicken. The transactions in question were sales of frozen chicken to a buyer in Russia, KVADRO.

* In connection with Sams' business, Lloyd's issued an open policy of insurance (the "Policy") to Sams for a period of one year, commencing February 1, 2002. When Sams obtained a shipment of chicken for which it needed coverage, Sams would contact Lloyd's with the particulars of the shipment, and a certificate of insurance would be issued.

* Sams obtained certificates of insurance identified by numbers B2913345 and B2913347 for shipments of chicken to St. Petersburg, Russia, pursuant to Invoices 199 and 206, which invoiced the shipment of 24 containers of frozen chicken (the "Cargo") to KVADRO.

* Invoices 199 and 206 contain all the terms of the contracts between Sams and KVADRO for these shipments.

* The shipment terms stated in Invoices 199 and 206 were C.I.F.[3] Sams maintains that this was a typographical error, and

---

[2]P&O did not dispute the statement of facts, although it filed two documents entitled "Certification In Opposition To Third Party Defendant's Motion For Summary Judgment." These "Certifications," which are signed by P&O's attorney, take the form of unsworn declarations under penalty of perjury as provided by 28 U.S.C. §1746. To the extent that they purport to place facts before the Court, they are, in substance, testimony by the attorney for a party, and as such cannot be accepted as evidence in this matter.

[3]The U.C.C. abbreviation for "cost, insurance, and freight."

that the shipment terms should have been F.A.S.[4]

* The payment terms stated in Invoices 199 and 206 were 20% down, 20% upon shipment, and 60% nineteen days after discharge.

* Sams complied with all its obligations under the terms of the contract between Sams and KVADRO.

* The Cargo invoiced on Invoices 199 and 206 was shipped from New Orleans, Louisiana, and arrived in St. Petersburg on four separate shipments, on March 3, 2002; March 4, 2002; March 26, 2002; and April 5, 2002.

* The original consignee for the Cargo was OOO Diliat, but on March 27, 2002, Sams requested that the consignee be changed to OOO Techpromptorg ("Techpromptorg") on instructions from KVADRO.

* On April 15, 2002, the Veterinary Department of the Russian Federation revoked all previously-issued veterinary permits for import of poultry from the United States. Customs clearance of poultry in Russia is impossible without appropriate veterinary permits.

* As of April 15, 2002, Techpromptorg had not arranged for customs clearance of the 24 containers, and therefore had to reapply for the necessary veterinary permits before clearance could be obtained. Techpromptorg had not received the new permits as of June 17, 2002.

---

[4]The U.C.C. abbreviation for "free alongside."

* Applicable Russian Customs regulations require customs clearance of goods no more than two months after their arrival in port ("the sixty-day rule").

* Because of the delay caused by the blanket revocation of veterinary permits, Techpromptorg was unable to arrange for customs clearance of the Cargo within two months of its arrival in port.

* Russian Federation officials of the Baltic Customs House issued protocols on June 8, 2002, and June 18, 2002, instituting an investigation of the apparent violation of the sixty-day rule in connection with the Cargo.

* Techpromptorg applied for an extension of the sixty-day rule, on grounds of the delay caused by the blanket cancellation of all veterinary permits, but this request was refused. Techpromptorg appealed this decision to the State Customs Committee of the Russian Federation Baltic Customs House.

* Before the foregoing investigation and appeal were completed, the Cargo was seized. The nature of this seizure – whether it was legal or not – is disputed by the parties.

* The poultry in fourteen of the twenty-four containers was sold before the completion of the investigation and appeal.

* Ultimately, Techpromptorg prevailed on the appeal, and was granted the requested extension of the sixty-day rule. The State Customs Committee then ruled that the proceeds of the sale

of the fourteen containers should be turned over to the owner of the poultry.

* Sams did not receive any part of the proceeds of the sale of chicken from the fourteen containers.

* The State Customs Committee also ruled that the remaining ten containers, with Cargo intact, should be turned over to the owner after clearing customs. This ruling apparently placed the ten containers back in the possession of P&O. Before these containers were picked up by Techpromptorg as consignee for KVADRO – or returned to Sams - they were seized anew by Russian authorities, this time as part of a different investigation involving Techpromptorg. These ten containers have not been returned to P&O or to Sams.

* Sams made a claim under the Policy for all twenty-four containers of Cargo sold to KVADRO pursuant to Invoices 199 and 206. When this claim was denied, Sams filed the pending third-party complaint against Lloyd's.

4. Lloyd's makes the following arguments for summary judgment in its favor:

* that P&O is not an intended third-party beneficiary of the Policy;

* that Sams had no insurable interest in the cargo at the time of the loss;

* that the Policy does not cover credit risks;

*      that the Policy specifically excluded losses arising out of the seizure of insured cargo by customs officials.

5.  Lloyd's first argues that it is entitled to summary judgment on P&O's claim because P&O cannot show itself to be a third-party beneficiary of the Policy.  Lloyd's points out that under Arkansas law, "[t]he presumption is that parties contract only for themselves, and a contract will not be construed as having been made for the benefit of third parties unless it clearly appears that such was the intention of the parties. **Little Rock Wastewater Utility v. Larry Moyer Trucking, Inc., 321 Ark. 303, 902 S.W.2d 760 (1995).** Lloyd's clearly did *not* intend the Policy to benefit a third party because the Insurance Cover Note of the Policy specifically provides:

> Neither this insurance nor any certificates issued hereunder confer any benefits on any third parties.  No third parties may enforce any term of this insurance or of any certificate issued hereunder.

P&O makes no attempt to refute this argument, either legally or factually.  The Court therefore concludes that summary judgment in favor of Lloyd's on the claim of P&O should be granted.

6.  Lloyd's next argues that it is entitled to summary judgment on Sams' claim because Sams had no insurable interest in the Cargo at the time of the loss, and the Policy provides that "[i]n order to recover under this insurance the Assured must have an insurable interest in the subject-matter insured at the time of the loss."

Lloyd's argues that because the goods were shipped C.I.F., title and the risk of loss passed to KVADRO upon delivery of the goods to the carrier, and Sams no longer had an insurable interest at that point, citing **Steuber Co., Inc. V. Hercules, Inc., 646 F.2d 1093 (5th Cir. 1981).** The Fifth Circuit in that case recognized that

> [t]he Uniform Commercial Code has codified the well-settled principles of commercial law relating to C.I.F. contracts. A contract containing the phrase C.I.F. plus a destination requires the seller to deliver goods meeting the contract description on an appropriate carrier, obtain prepaid bills of lading and appropriate insurance certificates for the goods, and then tender these documents plus an invoice to the buyer. Upon tender of these documents, the buyer must pay the full C.I.F. price to the seller. Delivery and possession of conforming goods then becomes a matter between the buyer and the carrier and/or insurer of the goods, but the seller's involvement in the transaction is at an end. In order words, under C.I.F. terms, the buyer pays on delivery of *documents*; the risk of loss during shipment and the responsibility for delivery and unloading of the *goods* are for the buyer.

**646 F.2d at 1096-97** (emphasis in original).

Under the Arkansas codification of the Uniform Commercial Code, a "seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him." **A.C.A. §4-2-501.**

The undisputed facts reflect that title to the goods had passed to KVADRO before the seizure of the Cargo. Under **A.C.A. §4-2-401,** "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his

performance with reference to the physical delivery of the goods." Sams had complied with all its obligations under the terms of the contracts between Sams and KVADRO. Invoices 199 and 206 contain all the terms of the contracts, and there is no reservation in those Invoices with reference to when title to the goods was to pass.

The uncontradicted testimony of Andrew Sams also reflects that his company did not retain any security interest in the Cargo. It thus appears to the Court that Sams did not have an insurable interest in the Cargo at the time of the seizure.

Sams does not dispute the law cited by Lloyd's in support of this argument, but bases its response entirely on its contention that there is a genuine dispute of material fact over what the Invoices' shipping terms were. Sams' brief states that

> [t]he testimony of Andrew Sams that the C.I.F. term on the Invoices was a typo raises a disputed fact question as to whether the shipping terms were C.I.F. or F.A.S. Prior invoices had provided F.A.S. as the shipping terms. There was no known reason why the shipping terms had changed. The way the transaction was conducted suggested that the shipping terms were F.A.S.

The Court has reviewed the testimony of Sams, and finds that it does not rise to the level of creating a disputed fact question on this issue. Sams testified that he was responsible for determining whether the terms of the sale would be F.A.S. or C.I.F., and that there was a *possibility* that the C.I.F. term was a typographical error, but he acknowledged that he was only

speculating about this possibility.  Speculation and possibility will not defeat summary judgment. **Moody v. St. Charles County, 23 F.3d 1410 (8th Cir. 1994).**

Because Sams has failed to meet proof with proof on the issue of whether it had an insurable interest, the Court finds that summary judgment in favor of Lloyd's on this basis is appropriate. That being the case, the Court need not address Lloyd's two remaining arguments in favor of summary judgment.

**IT IS THEREFORE ORDERED** that **Third Party Defendant's Motion For Summary Judgment** (document #51) is **granted,** and summary judgment in favor of Certain Underwriters at Lloyd's London Subscribing to Insurance Contract No. MC02ADXH will be entered by separate order of even date herewith.

**IT IS SO ORDERED.**

    **/s/ Jimm Larry Hendren**
    **JIMM LARRY HENDREN**
    **UNITED STATES DISTRICT JUDGE**